In the Matter of JEAN BENNETT, as Mother and Natural Guardian of ERICA BENNETT, an Infant, Appellant, v CITY SCHOOL DISTRICT OF NEW ROCHELLE, Respondent.

Second Department, December 30, 1985

**APPEARANCES OF COUNSEL**

*Ira Richard Bennett* for appellant.

*Kaye, Scholer, Fierman, Hays & Handler (Peter A. Walker* and *Lori M. Manzer* of counsel), for respondent.

**OPINION OF THE COURT**

RUBIN, J.

This appeal presents two issues for review. The first question we must determine is whether Education Law article 90 or the education article of the State Constitution (NY Const, art XI, § 1) imposes an affirmative duty upon a school district to implement a full-time education program for all students identified as gifted in the district. If the answer is no, we must also determine whether a lottery method of selecting a limited number of students from a group of eligible applicants for participation in a full-time program for gifted children is either arbitrary and capricious or violative of the equal protection clauses of the Federal Constitution (US Const, 14th Amend, § 1) or the State Constitution (NY Const, art I, § 11).

Since 1976, respondent City School District of New Rochelle (school district) has operated a full-time program for "Talented and Gifted" elementary school children (TAG program). In 1976, the TAG program, which was designed to provide specialized educational services in a self-contained unit exclusively for children identified by respondent as "gifted", was validated by the New York State Education Department. Said determination was based upon an on-the-site inspection and an evaluation report submitted by the school district, which set forth the nature and goals of the program, the manner in which it would be operated, and the procedure for admission into the program.

With respect to admission into the TAG program, the school district first identified gifted students eligible for the program based on the following criteria: (1) placement within the top 2% of national norms on either the Cognitive Abilities Test or the Iowa Test of Basic Skills in reading or mathematics; or (2) placement within the top 4% of the "building" norms established for his or her elementary school on any of the above tests; or (3) a minimum evaluation grade determined by a teacher through the use of the Renzulli Scale measuring unusual creativity, with the additional requirement that the child receive the recommendation of his or her teacher or principal for admission to the program. From the pool of students identified by the school district as "gifted", the participants for the TAG program were selected through a random lottery, because the number of eligible students exceeded the capacity of the TAG program. This lottery procedure has been utilized to determine admission into the full-time TAG program from its inception to date and the New

York State Education Department was cognizant of this procedure when it approved the program.

In 1981, respondent instituted a modified TAG program, in view of the success of the full-time program and in recognition of the fact that the full-time program could not accommodate the number of students identified by respondent as gifted. The same identification process utilized to determine eligibility for participation in the full-time TAG program was applied to the modified program. In comparison with the full-time TAG program, gifted children enrolled in the modified program only meet for a portion of the school day to receive special instruction in the areas of mathematics and reading-language arts and for the remaining school day participate with their grade-level classmates in other subject areas.

On June 14, 1984, petitioner was notified that her daughter Erica had been identified as eligible for the TAG program. Petitioner was further informed that there were only 27 slots available in the full-time program and that final participants would be selected by means of a lottery drawing. Respondent had identified a total of 109 children as gifted. Although both of Erica's parents objected to the use of a lottery, Erica's father requested that his daughter be included in the lottery drawing. Shortly thereafter, the lottery was conducted, but Erica was not selected to participate. Erica was ultimately offered placement in the modified TAG program.

By order to show cause, dated July 18, 1984, petitioner commenced this CPLR article 78 proceeding seeking, *inter alia,* to compel respondent to admit Erica into the full-time TAG program and to restrain respondent from continuing the program until such time as appropriate provisions guaranteeing the educational rights of all gifted students are established. Petitioner argued that the lottery method of selection was inconsistent with the legislative intent in enacting Education Law article 90, was violative of the equal protection clause and was arbitrary and capricious. Special Term rejected petitioner's contention that article 90 imposed an affirmative duty upon respondent to provide special education services for all of its gifted pupils. Special Term dismissed the petition, stating, in part, that "the use of a lottery in a case such as ours is a legitimate, fair and neutral selection mechanism. Given the limitations upon the size of the program, the use of a lottery to satisfy those limits was neither arbitrary nor capricious nor a violation of any of the petitioner's constitutional rights".

Petitioner subsequently moved for leave to renew, alleging that respondent closed its books for the 1983-1984 school year with a monetary surplus exceeding the amount originally projected by quite a substantial sum; that respondent had a mandated duty to utilize all of the funds available to it; and that respondent could, therefore, have admitted her daughter into a full-time TAG program without resorting to a lottery. Special Term granted the motion to renew and, upon renewal, adhered to its prior decision, concluding that "[e]ven assuming that the respondent had greater funds than those originally brought to the Court's attention, there was no obligation on the part of respondent to apply those funds to the TAG program, nor would the existence of such funds otherwise render the respondent's implementation of the program arbitrary or unreasonable". Petitioner appeals from this order.

## I

By denying Erica and other "gifted" children enrollment in the full-time, self-contained TAG program, petitioner contends that respondent has breached an affirmative duty to provide a quality education for these children in accordance with their needs and abilities in violation of Education Law article 90.

■ Cognizant of the lack of a comprehensive program for the education of gifted pupils in this State, the Legislature enacted Education Law article 90 (L 1982, ch 740, § 2), entitled "Gifted Education". Article 90 *(see,* Education Law § 4451 *et seq.)* is an enabling act, which authorizes and empowers the New York State Education Department to assist school districts in meeting the educational needs of its gifted population (Education Law § 4451), *inter alia,* by establishing procedures to identify gifted students and developing educational guidelines responsive to their needs and abilities *(see,* "An Act to amend the Education Law in relation to gifted pupils", memorandum in support of Senate Bill No. 3564-B and Assembly Bill No. 4590-B). In furtherance of the State's duty to provide a quality education for all pupils in accordance with their needs and abilities, the Legislature declared that "school districts of this state *should* develop programs to insure that children reach their full academic potential" and "[a]mong such programs *should* be programs to aid and assist gifted pupils" (L 1982, ch 740, § 1, eff Sept. 1, 1982; emphasis supplied). The Legislature's use of the term "should", rather than shall or must, evidences that the establishment of pro-

grams for gifted children by school districts is optional, not mandatory. As noted in a memorandum in support of the legislation, "the bill gives school districts the power to provide instruction * * * for Gifted Pupils" (see, Education Law § 3204 [2-b]). "This bill is not a mandate as a district can decide if the programs will be offered" ("An Act to amend the Education Law in relation to gifted pupils", memorandum in support of Senate Bill No. 3564-B and Assembly Bill No. 4590-B). Thus, it is clear that article 90 does not impose upon respondent an affirmative duty to provide programs for the gifted, nor to place every pupil identified as gifted into an existing program.

Article 90 only requires a school district which receives State aid for the education of gifted students (see, Education Law § 3602 [23]) to use those funds for said purpose and in accordance with the guidelines established by the Commissioner (Education Law § 4452 [1] [c]). While the legislation encourages the development of programs to ensure that gifted students reach their full potential, it does not specify or mandate that any particular type of program be implemented. The decision as to the type of program to be implemented (provided the program comports with the Commissioner's guidelines) and its operation and management, is vested in the discretion of the governing boards of local school districts (see, Education Law § 3204 [2-b]; § 4452). The guidelines promulgated by the Commissioner recognize that there is a great variation in programs and that there is no single program model or programming option that has been proven to be effective for all students. These guidelines specifically provide that each school district should exercise its discretion and select from a wide range of program management options "on the basis of the needs of the gifted student population and factors in the local district", such as the financial resources and other competing educational needs of the local school district (see, Local Guidelines for Educating Gifted Students, University of the State of New York, The State Education Department, at 7 [1984 reprint]). The guidelines outline several options with suggestions for the implementation of each program, including: a "pullout" program (gifted students are removed from their classroom and placed in an out-of-classroom location for at least 20% of the school day); cluster grouping (cluster groups of gifted students are placed in a regular classroom and receive differentiated instruction based on their special needs); acceleration (gifted students are moved more rapidly through the usual sequence of instruction and

above grade level materials are utilized); homogeneous grouping (gifted students are placed together in a single class exclusively for gifted students); gifted student in regular classroom (gifted student remains in regular heterogeneous classes and individualized instructional approaches are used to differentiate the program to meet their needs); and mentor program (gifted students are matched to mentors or guides who work with them in individually selected areas) *(see,* Local Guidelines for Educating Gifted Students, University of the State of New York, The State Education Department, at 7-10 [1984 reprint]). Contrary to petitioner's contention,. article 90 does not require respondent to educate all pupils identified as gifted in a full-time, self-contained TAG program (i.e., the "homogeneous grouping" option). The design of article 90 is consistent with the traditional discretion vested in the governing board of local school districts, possessing special expertise, to determine the operation and management of curricula and programs best suited for the instruction of their varied student bodies *(see generally,* Education Law § 1709 [3], [4]; § 2503 [3], [4]; *Matter of Ackerman v Rubin,* 35 Misc 2d 707, *affd* 17 AD2d 796).

Relying on Education Law § 3602 (23), petitioner argues that the Legislature's increase in the appropriation of aid to gifted programs obligates school districts to maintain a fulltime TAG program for all gifted pupils in the district. Reliance on this section is misplaced. Education Law § 3602 (23) merely sets forth the formula to be utilized in computing the amount of aid to which a school district operating a TAG program is entitled.* It does not mandate that a school district maintain any particular type or size TAG program. According to the New York State Education Department Guidelines for Gifted Education Program Aid for the 1983-1984 school year, the "funds may be used to supplement current State * * * funded programs or to begin, support, or expand locally funded programs".

Aside from the mandate to use State funds to provide for services to gifted pupils (Education Law § 4452 [1] [c]), there

---

* Education Law § 3602 (23) provides: "23. Gifted and Talented Program Aid. In addition to any other aid computed under the provisions of this section, a school district which conducts a gifted and talented program in accordance with regulations of the commissioner adopted for such purpose shall be entitled to an amount computed by multiplying one hundred forty dollars by three per centum by the adjusted average daily attendance of such district".

are no mandatory directives regarding specific utilization of these funds (see, Education Law § 3602 [23]). Broad categories for which gifted formula aid could be used by respondent included: "Planning for a Program", "Establishing Identification Procedures"; "Instructional Strategies/Teacher Styles Conferences"; "Curriculum Development", and "Teacher Training/Workshops" (State Education Department, Fact Sheet on Programs for the Gifted 1983-1984, at 4). Thus, respondent was not legally obligated to expend the funds obtained pursuant to Education Law § 3602 (23) on expanding the full-time TAG program. Moreover, how school surplus revenues are to be expended is a discretionary matter committed by law to the judgment of the local Board of Education (see, Education Law § 2521; *Matter of Schamel v Board of Educ.,* 61 AD2d 1115, *lv denied* 44 NY2d 649; *Matter of Leeds v Board of Educ.,* 19 Misc 2d 860, 861, 862, *affd* 9 AD2d 905; *Matter of Lawson,* 18 Ed Dept Rep 314). While a judicial proceeding may be brought to prevent an illegal disbursement or to compel a legally required disbursement of public funds (see, *Boryszewski v Brydges,* 37 NY2d 361, 364; *Matter of Abrams v New York City Tr. Auth.,* 39 NY2d 990, 992), this case presents questions of " 'judgment, discretion, allocation of resources and priorities' " lodged in school administrative agencies, which are inappropriate for resolution in the judicial arena (see, *James v Board of Educ.,* 42 NY2d 357, 368, quoting from *Matter of Abrams v New York City Tr. Auth., supra,* at p 992). Accordingly, Special Term correctly concluded that, in the absence of a showing by petitioner of clear illegality of official action, respondent could not be compelled to utilize its budget in any particular manner, such as using the budget surplus for expanding the full-time TAG program (see, *Matter of Schamel v Board of Educ., supra).* It is beyond the power of this court in this litigation to determine whether the State's funds appropriated to respondent for education for the gifted have been wisely directed or reasonably applied, or whether its budget was fairly divided in terms of priority of needs between competing educational interests in the community.

In support of her contention that Erica had a right to a particular type or level of special educational services, petitioner attempts to draw an analogy to cases construing the rights of handicapped children because the funding for educational programs for both the handicapped and the gifted child are set forth in the same provisions of the Education Law and both classes of children are in need of special educational

programs or services in order to realize and achieve their full potential. Although the apportionment of public funds for specialized educational services includes both programs for the handicapped and for the gifted *(see,* Education Law § 3602-c [1] [a], [b]), petitioner's reliance on the case law interpreting the rights of the handicapped is inapposite. The education of a handicapped child is governed by Education Law article 89 *(see,* Education Law § 4401 *et seq.)* as well as by a Federal statute, the Education of the Handicapped Act (20 USC § 1400 *et seq.).* Education Law article 89 imposes upon a school district affirmative duties owed to children unable to learn in a regular school program by reason of a specific handicap *(see,* Education Law § 4402; *see also,* 20 USC § 1412 [1]) and sets forth a comprehensive system of mandatory procedures to be followed in the identification, placement, and education of the handicapped student *(see,* 8 NYCRR 116.6, 200.1 *et seq.).* There are even mandatory requirements governing the size, population and nature of special classes for specific handicapped conditions *(see generally,* 8 NYCRR 200.14, 200.6, 200.13). In stark contrast, article 90 and regulations thereunder merely set forth educational objectives and do not refer to the manner in which programs should operate. The size of the program, the population of the program or the nature and type of program to be implemented with respect to the gifted child are left to the discretion of local school districts *(see,* 8 NYCRR 142.4; Local Guidelines for Educating Gifted Students, University of the State of New York, The State Education Department, at 7-10 [1984 reprint]).

In accordance with Education Law article 90, respondent submitted to the Commissioner of Education a summary plan concerning the identification and education of gifted pupils *(see,* Education Law § 4452 [1] [b]; 8 NYCRR 142.4). The Commissioner was informed that selection for the full-time TAG program would be conducted by a lottery system and that a modified program was being instituted to supplement and enhance the learning experiences of the gifted children who were not selected or who did not elect to participate in the full-time TAG program. The Commissioner approved this plan and such approval was consistent with and in furtherance of the statutory goals of article 90. Notwithstanding petitioner's protestations to the contrary, respondent owed no statutory duty to place her child into the educational program of petitioner's choice. Furthermore, the court system is not the proper forum to test the validity of the educational decision to

place a particular student in one of the many educational programs offered by the schools of this State. "[A]ny dispute concerning the proper placement of a child in a particular educational program can best be resolved by seeking review of such professional educational judgment through the administrative processes provided by statute. (See Education Law, § 310, subd 7.)" *(Hoffman v Board of Educ.,* 49 NY2d 121, 127). As previously stated by the Court of Appeals, the courts will intervene in the administration of the public school system only in the most exceptional circumstances involving "gross violations" of defined public policy *(see, Donohue v Copiague Union Free School Dist.,* 47 NY2d 440, 445; *Matter of New York City School Bds. Assn. v Board of Educ.,* 39 NY2d 111, 121; *Hoffman v Board of Educ., supra).* No such circumstances are present here.

▪ We further conclude that respondent did not violate the education article of our State Constitution (NY Const, art XI, § 1), merely because petitioner's daughter was not selected for the full-time TAG program. That article requires that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated". What appears to have been contemplated when that article was adopted at the 1894 Constitutional Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State *(see, Board of Educ. v Nyquist,* 57 NY2d 27, 47). The Court of Appeals construed the term "education" in NY Constitution article XI as connoting a "sound basic education" *(Board of Educ. v Nyquist, supra,* at p 48). This general directive was never intended to impose a duty flowing directly from a local school district to individual pupils to ensure that each pupil receives a minimum level of education, the breach of which duty would entitle a pupil to compensatory damages *(see, Donohue v Copiague Union Free School Dist., supra,* at p 443).

Here, petitioner has not alleged, nor in all likelihood could she prove, that the modified TAG program or even the conventional classroom, would not provide a "quality education" *(see,* L 1982, ch 740, § 1), let alone a "sound basic education", for her child. Particularly instructive on this issue is the case of *Johnpoll v Elias* (513 F Supp 430). In *Johnpoll (supra,* at p 431), the father of a gifted student, who was also alleged to be emotionally and physically handicapped, brought an action

against a Board of Education alleging that the Board had denied his son's constitutional and statutory " 'rights to a decent education' ". The plaintiff moved for a preliminary injunction, enjoining the defendant from compelling his son to attend the high school to which he had been assigned and directing the Board to permit him to attend a high school of his choice. In denying the motion, the United States District Court noted that although the right to an education under the NY Constitution, article XI, § 1 " 'must be made available to all on equal terms,' *Brown v. Board of Education,* 347 U.S. 483, 493", the mere fact the child "is not being permitted to attend the school of his choice is not tantamount to a denial of a right to an education" *(Johnpoll v Elias, supra,* at pp 431-432). Similarly, the fact Erica is not being permitted to attend the educational program of her choice is not a denial of her constitutional right to an education.

## II

■■ Lastly, we reject petitioner's contention that the use of a lottery to select the final participants in the full-time TAG program was arbitrary and capricious and violative of the equal protection clause of either the US Constitution (14th Amend, § 1) or the NY Constitution (art I, § 11).

■ Respondent established an identification procedure to ascertain which students in its district were eligible for participation in the full-time gifted program. Petitioner has not shown that her child was more entitled to selection to this program than anyone else in said class or that respondent abused its discretion in limiting the number of students in the program based on educational concerns and its allocation of limited financial resources among competing educational needs. Cognizant that there was not enough room for all of the gifted students in this program, the use of the lottery was an impartial and fair manner of selecting the participants. The utilization of the lottery for the selection of students to certain classes has long been held to be neither arbitrary and capricious nor forbidden by law *(see, Matter of Feldman,* 16 Ed Dept Rep 282; *Swann v Charlotte-Mecklenburg Bd. of Educ.,* 362 F Supp 1223, 1238, *appeal dismissed* 489 F2d 966 [wherein the court suggested a lottery as an acceptable method of implementing a desegregation plan]; *Matter of Doe v Spillane,* Sup Ct, Westchester County, June 1, 1978, Dickinson, J.)

■ For the purposes of equal protection analysis, the right to free, public education is not classified as a "fundamental" constitutional right entitled to special constitutional protection under either the Federal Constitution *(see, San Antonio School Dist. v Rodriguez,* 411 US 1; *Board of Educ. v Nyquist,* 57 NY2d 27, 46, *supra)* or this State's Constitution *(see, Matter of Levy,* 38 NY2d 653, *appeal dismissed sub nom. Levy v City of New York,* 429 US 805, *reh denied* 429 US 966; *Board of Educ. v Nyquist, supra).* Thus, the proper standard for review of the government action in question is the rational basis test, i.e., the use of the lottery must have a rational relationship to a legitimate State purpose *(see, Board of Educ. v Nyquist, supra).* As summarized in respondent's brief, "[t]he random lottery serves the legitimate purpose of selecting participants for the full-time TAG program in an objective manner without discrimination against any group of students. The School District's inability to admit all eligible students into the same enriched program justifies the use of a non-discriminatory and non-subjective selection process which is rationally related to the School District's legitimate goal of improving its educational system".

In summary, we conclude that neither Education Law article 90 nor the education article of the NY Constitution (art XI, § 1), imposed an affirmative duty upon respondent to provide a full-time TAG program for all students identified by respondent as gifted. We further conclude that respondent's use of a lottery, as a nondiscriminatory method of selecting a limited number of gifted students from a class of eligible applicants for participation in the full-time TAG program, was neither arbitrary and capricious nor violative of the equal protection clause of the US Constitution, 14th Amendment, § 1, or the NY Constitution, article I, § 11. Accordingly, we should affirm so much of the order dated December 10, 1984, as, upon renewal, adhered to its original determination dismissing the proceeding.

BROWN, J. P., O'CONNOR and WEINSTEIN, JJ., concur.

Order of the Supreme Court, Westchester County, dated December 10, 1984, affirmed insofar as appealed from, with costs.